UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
ALBANY DIVISION

In re:

**TURKEY LAKE, LLC, et al.**,

*Debtors*,

**ANTHONY GIORDANO, TRUSTEE**,

*Plaintiff*,

-*vs*-

**RIZZO, DIGIACCO, HERN & BANIEWICZ CPAS, PLLC**,

*Defendant*.

Chapter 11

Case No.: 15-12091 (REL)

(Jointly Administered)

Adv. Proc. No.: 17-90063-1-rel

### DECLARATION OF THOMAS B. CRONMILLER IN OPPOSITION TO PLAINTIFF'S MOTION TO DISQUALIFY THE DEFENDANT'S EXPERT, JAMES I. MARASCO

Thomas B. Cronmiller, in accordance with 28 U.S.C. § 1746, declares as follows under penalty of perjury:

1.     I am a partner in the law firm of Barclay Damon LLP, attorneys for Defendant Rizzo, DiGiacco, Hern & Baniewicz, CPAs, PLLC ("Defendant"), in the above-captioned action. I am familiar with the facts, circumstances, and documents referred to herein.

2.     I submit this Declaration in opposition to Anthony Giordano, Trustee's ("Trustee") motion seeking to disqualify the Defendant's expert witness, James I. Marasco, CPA/CFF, CFE, CIA as Mr. Marasco was never engaged or retained by the Trustee in any capacity whatsoever.

3.     Your declarant's decision to engage Mr. Marasco and his firm as the Defendant's expert had nothing to do with any conversations Mr. Marasco may or may not have had with Mr.

Giordano or Ms. Bass.  Rather, I retained Mr. Marasco based upon Mr. Marasco's experience and expertise.

4.    There was no engagement between the Trustee, Ms. Bass and Mr. Marasco with respect to the instant lawsuit. There is nothing  in writing memorializing the terms and conditions of any relationship between the Trustee, Ms. Bass and Mr. Marasco.  The fact that Mr. Marasco may have spoken to and/or met with the Giordano and Ms. Bass does not establish an engagement.

5.    Ms. Bass offers nothing to this court besides self-serving allegations as to what  she believed Mr. Marasco agreed to provide.  *See* Bass Declaration at ¶4.  Ms. Bass produces no evidence in the form of correspondence, emails or written documentation of any kind proving she requested the expert services of Mr. Marasco and that Mr. Marasco agreed to provide  such professional assistance.  In fact, no such evidence exits.  Accordingly, Ms. Bass's self-serving statements must be rejected.

6.    Furthermore, while Mr. Giordano claims that he has documentation consisting of contemporaneous time charges reflecting a 2 hour telephone call with "EFPR/Stonebridge"  on March 11, 2016, Mr. Giordano  failed to produce to the Court these contemporaneous time charges not only in connection with the Trustee's motion, but failed to turn over these documents in discovery in connection with this action.

7.    Significantly, at the time of the purported telephone call with Mr. Marasco on March 11, 2016, Mr. Giordano had not yet  been confirmed as the Trustee.  Mr. Giordano was confirmed as the Trustee on  March 16, 2016.  A copy of the Confirmation Order filed March 16, 2016 is attached as Exhibit "A."  The Trustee could not have engaged Mr. Marasco as his expert nor had confidential communications with Mr. Marasco as Trustee on March 11, 2016, because Mr. Giordano was not yet the Trustee, and had no authority in his capacity as Trustee.

8.    Additionally, Mr. Giordano, at best, is uncertain whether it was  Mr. Marasco he spoke with on March 11, 2016 as he states he "believe[s] [he] spoke directly to Mr. Marasco." Certainly, if the call was "detailed in contemporaneous time charges" as Mr. Giordano claims it was, such detail would include the name of the individual with whom he spoke.  Besides, how could Mr. Giordano engage Mr. Marasco as an expert or impart allegedly confidential information when Mr. Giordano isn't certain who he spoke with.

9.    Mr. Giordano fails to provide any detail of what was discussed on the alleged telephone call with Mr. Marasco.  Mr. Giordano self-servingly claims that he believed that what was discussed would remain confidential, despite the fact that Mr. Giordano offers no evidence of what communications were confidential; offers no evidence that he told Mr. Marasco that the communications were confidential; that Mr. Marasco agreed to keep the communications confidential or was being retained as Mr. Giordano's expert; or of proof of  an engagement or of a confidentiality agreement.  Mr. Giordano's alleged and unsubstantiated unilateral belief that the conversation would remain confidential is not binding on Mr. Marasco.

10.    Mr. Giordano and Ms. Bass attended one brief meeting in May 2016 with Mr. Marasco.  They make only vague assertions that "confidences" were discussed.  Neither Giordano nor Ms. Bass provide any detail at all regarding "litigation strategy and work-product" that were disclosed and discussed, nor do they include as an exhibit to the Trustee's motion any confidential documentation that was purportedly disclosed to Mr. Marasco.  Not only do Mr. Giordano and Ms. Bass fail to identify what "confidences" were discussed with and disclosed to Mr. Marasco, but they also fail to show how those purported confidences impacted Mr. Marasco's opinion.  A copy of Mr. Marasco's expert disclosure is attached as Exhibit "B."

11.     Like the March 11, 2016 telephone call, Mr. Giordano claims that the May 2016 meeting was "detailed in [his] contemporaneously maintained time records and calendar." Yet, these time records and calendars were never disclosed during discovery nor have they been provided to the Court as an exhibit to the instant motion.[1]

12.     Ms. Bass  claims  she believed that Mr. Marasco had a confidential relationship with her and Mr. Giordano, yet Ms. Bass did not hire Mr. Marasco, did not pay him for his services and did nothing to confirm in writing that the communications were confidential as she alleges or that Mr. Marasco was barred from serving as an expert for the Defendant on account of this conversation.  *See* Memorandum of Law.

13.     Further, Ms. Bass could not have  had even such a misplaced belief since, at the time of the May 2016 meeting with Mr. Marasco, Ms. Bass was associated with the law firm of LeClairRyan, attorneys for the debtor, Turkey Lake.   Neither Ms. Bass nor LeClairRyan represented the Trustee.

14.     Ms. Bass did not nothing to convey her intentions to Mr. Marasco.  She did not engage the services of Mr. Marasco; she did not express to him that the discussions had at the May 2016 meeting should be kept confidential; she did not ask that he sign a confidentiality agreement; nor did she ever contact Mr. Marasco again following the May 2016 meeting.  *See* Marasco Declaration at ¶¶ 4-6.

15.     It is disingenuous for Mr. Giordano and Ms. Bass to advance hyperbole that Mr. Marasco "switched sides" where there was no relationship with Mr. Marasco to begin with, confidential or otherwise; Mr. Marasco was never engaged; he was never paid; nor was he ever contacted again after the May 2016 meeting.

---

[1] It is significant to note that both the purported March 11, 2016 telephone call and the May 2016 meeting occurred more than a year and a half before the Plaintiff commenced the instant lawsuit on December 20, 2017.

16.    Ms. Bass suggests that Barclay Damon had an obligation to contact her to address what she and Mr. Marasco had discussed and to confer about whether she believed there was a conflict of interest.  Yet, Ms. Bass cites to absolutely no case law or authority in support of this absurd contention.

17.    Ironically, Ms. Bass took no steps to confer with your declarant regarding any concerns she had about Barclay Damon's retention of Mr. Marasco between December 3, 2020 when Ms. Bass received Defendant's Expert Disclosure and January 15, 2021 when Ms. Bass deposed Mr. Marasco for seven hours.

18.    It should be noted that the Defendant was prepared to disclose Mr. Marasco as an expert in 2019 and sent the Trustee's counsel proposed Scheduling Orders on two occasions, but Trustee's counsel refused to agree to an Expert Scheduling Order and would not agree to any dates as to when expert disclosure would be provided.  In fact, it wasn't until a conference call on June 17, 2020 with Judge Littlefield that Trustee's counsel finally agreed to expert disclosure, which included the Defendant's deadline of December 3, 2020.

19.    Finally, while Ms. Bass includes a "Reservation of Rights" statement in her declaration, she not permitted multiple opportunities to keep bringing motions on the same or similar issues for the same or similar relief.  Any attempts by Ms. Bass seeking to undermine the ruling on this motion by bringing further motions or *in limine* motions during the course of the trial should be denied.

20.    The Trustee's motion is frivolous and without any merit.  Accordingly, it should be denied in its entirety.

**WHEREFORE**, Defendant respectfully requests the Court deny the Plaintiff's motion to disqualify the Defendant's expert in its entirety,  together with such other and further and additional relief as this Court deems just and proper.

**DATED:**        February 3, 2021                    **BARCLAY DAMON LLP**

                                    By:    s/ Thomas B. Cronmiller
                                            Thomas B. Cronmiller
                                            Bar Roll #301307

                                            Roy Z. Rotenberg
                                            Bar Roll # 506657

                                            Jeffrey A. Dove
                                            Bar Roll #101532


                                    *Attorneys for Defendant*
                                    Office and Post Office Address
                                    100 Chestnut Street, Suite 2000
                                    Rochester, New York 14604
                                    Telephone: (585) 295-4311
                                    Email: tcromiller@barclaydamon.com

# CRONMILLER DECLARATION
# EXHIBIT "A"

**FILED**

**MAR 1 6 2016**

OFFICE OF THE BANKRUPTCY CLERK
ALBANY, NY

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | |
| | Chapter 11 |
| TURKEY LAKE, LLC, *et al.*,[1] | Case No. 15-12091 (REL) (Main Case) |
| Debtors. | Jointly Administered |

## ORDER GRANTING FINAL APPROVAL OF DEBTORS' DISCLOSURE STATEMENT AND CONFIRMING DEBTORS' JOINT PLAN OF REORGANIZATION

---

[1] Debtors, along with the last four digits of each Debtor's tax identification number are: Turkey Lake, LLC (3488) ("Turkey Lake"); Premier Laser Spa of Albany, LLC (3453) ("Albany Laser Spa"); Cleveland Laser Spa, LLC (5481) ("Cleveland Laser Spa"); Columbus Laser Spa, LLC (3998) ("Columbus Laser Spa"); Lexington Laser Spa, LLC (6290) ("Lexington Laser Spa"); Nashville Laser Spa, LLC (5715) ("Nashville Laser Spa"); Premier Laser Spa of Baltimore, LLC (6976) ("Baltimore Laser Spa"); Premier Laser Spa of Boston, LLC (4240) ("Burlington Laser Spa"); Premier Laser Spa of Boston II, LLC (4998) ("Newton Laser Spa"); Premier Laser Spa of Cincinnati, LLC (7076) ("Cincinnati Laser Spa"); Premier Laser Spa of Greenville, LLC (1316) ("Greenville Laser Spa"); Premier Laser Spa of Indianapolis, LLC (4868) ("Indianapolis Laser Spa"); Knoxville Laser Spa, LLC (2122) ("Knoxville Laser Spa"); Premier Laser Spa of Louisville, LLC (6402) ("Louisville Laser Spa"); Premier Laser Spa of Pittsburgh, LLC (8087) ("Pittsburgh Laser Spa"); Premier Laser Spa of Virginia, LLC (4140) ("Virginia Beach Laser Spa"); Syracuse Laser Spa, LLC (6793) ("Syracuse Laser Spa"); Premier Laser Spa of Orlando, LLC (1227) ("Orlando Laser Spa"); Premier Laser Spa of St. Louis, LLC (2047) ("St. Louis Laser Spa"); Premier Laser Spa of Kansas City, LLC (7938) ("Kansas City Laser Spa"); Premier Laser Spa of Richmond, LLC (4482) ("Richmond Laser Spa"); Premier Laser Spa of Columbia, LLC (3919) ("Columbia Laser Spa").

17841158

THIS MATTER came before the Court upon the request of Turkey Lake, LLC and its affiliates (collectively, the "Debtors") seeking final approval of Debtors' Disclosure Statement dated January 22, 2016 (the "Disclosure Statement" – Docket No. 260) and confirmation of their Chapter 11 Joint Plan of Reorganization dated January 22, 2016 (the "Joint Plan" – Docket No. 259). Debtors' Disclosure Statement was filed on January 22, 2016.

The Court entered an Order Conditionally Approving the Disclosure Statement, Fixing Time for Final Hearing on Disclosure Statement, Fixing Time for Hearing on Confirmation, Filing Acceptances or Rejections of Plan and Fixing Dates, Combined with Notice Thereof on January 25, 2016 (the "Order Conditionally Approving Disclosure Statement et al." – Docket No. 264). Debtors having certified by counsel that, on January 25, 2016, they transmitted a copy of the Disclosure Statement and the Joint Plan to all creditors, Equity Interest holders and parties in interest, along with notice of a hearing on confirmation of the Joint Plan (*See* Docket No. 263). The Court convened a conference on confirmation on February 25, 2016.

The Disclosure Statement is approved on a final basis and the Joint Plan is confirmed based upon the resolutions set forth herein.

Two written objections to the Joint Plan and one written objection to the Disclosure Statement were filed and served and are resolved as follows:

1. On February 17, 2016, Wolf Road Park II, LLC ("Wolf Road"), landlord of Debtor Premier Laser Spa of Albany, LLC, objected to the proposed cure amount set forth in the Notice of (I) Debtors' Intent to (A) Assume and Assign, or (B) Reject Certain Executory Contracts and Unexpired Nonresidential Leases and (II) Cure Amounts (the "Cure Notice" – Docket Nos. 285, 286 and 291). Wolf Road's objection is resolved and withdrawn in consideration of Debtors' agreement to amend the cure amount to $6,215.44.

2. On February 22, 2016, WP Glimcher Inc. ("WP Glimcher"), agent of landlord to

2

Debtor of Indianapolis Laser Spa, objected to the proposed cure amount set forth in the Cure Notice. WP Glimcher's objection is resolved and withdrawn in consideration of Debtors' agreement to amend the cure amount to $3,703.18.

3. On February 22, 2016, Rizzo DiGiacco Hern & Baniewicz CPAs, PLLC ("RDHB"), submitted a limited objection to Debtors' Disclosure Statement requesting that certain language in the Disclosure Statement be deleted and redacted. The Court overruled RDHB's objection. Debtors have consented to the inclusion of the following language in this Confirmation Order: "In their Disclosure Statement, Debtors disclosed information about RDHB and their assessment of services performed by RDHB. RDHB disagrees with Debtors' characterization and analysis of those services as set forth in its Limited Objection to Debtors' Disclosure Statement at Docket No. 290."

Debtors have also agreed to amend the proposed cure amounts set forth in the Cure Notice as follows:

CSHV Springhurst LLC (Louisville non-residential lease) shall be amended in the amount of $5,518.11.

INDEP II LLC (Virginia Beach non-residential lease) shall be amended in the amount of $9,005.57.

A certification of the ballots, reflecting acceptance in the two voting Classes (Classes 2 and 3) by thirteen voting creditors and rejection by two voting creditors, was filed on February 23 and 24, 2016 (Docket Nos. 294 and 296). Pursuant to 11 U.S.C. § 1126(c), Debtors have received acceptance of at least two-thirds in dollar amount and more than one-half in number of the allowed claims of each voting Class of creditors.

Pursuant to Article IV of the Joint Plan, Anthony Giordano, the Debtors' Chief Financial Officer, shall be appointed as the Unsecured Creditor Trustee, to be paid at an hourly rate of $225.00, as set forth in the Unsecured Creditor Trust Declaration by the Unsecured Creditor Trustee that was filed on March 15, 2016 (Docket No. 303).

3

Debtors have also filed the Declaration of Ronald Castor (Docket No. 300) setting forth testimony as to the adequacy of the $100,000 escrow account established for Class 5 Creditors.

Based upon the resolution of all objections and the representations of counsel, the Court hereby makes the following findings of fact and conclusions of law:

1.        This Court has jurisdiction over Debtors' Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409. Confirmation of the Joint Plan is a core proceeding under 28 U.S.C. § 157(b)(2)(L). This Court has exclusive jurisdiction to determine whether the Joint Plan complies with the applicable provisions of title 11 of the United States Code (the "Bankruptcy Code") and should be confirmed.

2.        Under the facts and circumstances of the Chapter 11 Cases, the Disclosure Statement provided adequate information that would enable a hypothetical investor typical of the holders of impaired, voting Classes 2 and 3 claims to make an informed judgment about the Joint Plan as required by §1125 of the Bankruptcy Code.

3.        Proper notice of the Joint Plan and the payment provisions under the Joint Plan were provided to all creditors and parties in interest as required by the Order Conditionally Approving the Disclosure Statement et al. The notice was adequate and sufficient under the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), including but not limited to §§ 1126(f) and 1128 of the Bankruptcy Code, Bankruptcy Rules 2002(b), 3017.1 and 3020(b) and other applicable law.

4.        Votes to accept or reject the Joint Plan have been solicited and tabulated fairly, in good faith, and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws and regulations.

5.        The Joint Plan has been accepted by all the Classes of creditors whose acceptance is required by law.

4

6.      The Joint Plan and Debtors have complied with the applicable provisions of the Bankruptcy Code. All of the elements of 11 U.S.C. § 1129, required for confirmation of the Joint Plan, have been satisfied.

7.      The Joint Plan is proposed in good faith and not by any means forbidden by law.

8.      Any payment made or to be made by Debtors or by a person acquiring property under the Joint Plan for services or for costs and expenses or in connection with the Chapter 11 Cases, or in connection with the Joint Plan and incident to the Chapter 11 Cases, has been approved by the Court or is subject to the approval of the Court as reasonable.

9.      Each holder of a Claim or Equity Interest in an impaired Class of Claims or Equity Interests has accepted the Joint Plan or will receive or retain under the Joint Plan property of a value, as of the Effective Date of the Joint Plan, that is not less than the amount that such holder would receive if Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date of the Joint Plan.

10.     The Joint Plan does not discriminate unfairly and is fair and equitable with respect to Class 4 Equity Interests, the holders of which are impaired and have not accepted the Joint Plan, because no holder of any interest that is junior to the Class 4 Equity Interests shall receive any property under the Joint Plan.

11.     Creditors holding claims entitled to priority pursuant to §§ 507(a)(1) through (8) of the Bankruptcy Code inclusive are being paid as required by law or have agreed to treatment otherwise.

12.     At least one Class of Claims that is impaired has accepted the Joint Plan.

13.     Confirmation of the Joint Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of Debtors except to the extent that such liquidation is proposed under the Joint Plan.

5

14.     All fees due and payable under 28 U.S.C. § 1930 have been paid or the Joint Plan provides for the payment of all such fees on the Effective Date of the Joint Plan continuing until the Chapter 11 Cases are closed with a final decree or these cases are converted or dismissed, whichever occurs earlier.

15.     All fees due to become owing to the consumer privacy will be paid as the Joint Plan provides for the payment of all such fees.

16.     This Court shall retain jurisdiction over the Chapter 11 Cases following confirmation and until consummation of the Joint Plan for the purposes set forth in the Joint Plan.

17.     Pursuant to § 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of any security, or the making or delivery of any instrument of transfer under the Joint Plan, as confirmed, shall not be taxed under any law imposing a "stamp tax or similar tax" within the meaning of § 1146(a) of the Bankruptcy Code.

18.     The capitalized terms used in this Confirmation Order which are defined in the Joint Plan will have the same meanings when used in this Confirmation Order.

19.     The modifications to Section 9.2 of the Joint Plan agreed to by the Debtors and set forth in the second decretal paragraph below do not affect any Class nor do such modifications rise to a level of materiality that would require the re-noticing or the re-balloting of the Joint Plan.

UPON CONSIDERATION WHEREOF,

It is **ORDERED, ADJUDGED AND DECREED** that the Disclosure Statement is approved on a final basis pursuant to §1125 of the Bankruptcy Code.

It is **FURTHER ORDERED, ADJUDGED AND DECREED** that section 9.2 of the Joint Plan shall be amended to include the following language:

6

"Notwithstanding anything to the contrary in the Joint Plan or Disclosure Statement, the clauses in this section shall not apply in the case of an entity's conduct involving bad faith, breach of fiduciary duty, self-dealing or misconduct. The clauses in this section shall specifically not apply to any obligations owing from a personal guarantor to Genesee Regional Bank and will in no way alter, amend or replace those guarantors' obligations. Lastly, notwithstanding anything to the contrary in the Joint Plan or Disclosure Statement, no claim or obligation, suit, judgment, damages, debt, remedy, cause of action or liability of any nature whatsoever held by Inland Brownstones, L.L.C. ("Inland") against Premier Laser Spa of Milwaukee, LLC (collectively, "Inland Claims") is released, waived, voided, extinguished, or discharged and Inland is not enjoined from in any way pursuing any Inland Claims against Premier Laser Spa of Milwaukee, LLC."

It is further **ORDERED, ADJUDGED AND DECREED** that the Joint Plan, as modified above and incorporating by reference all of its provisions as if set forth at length herein, is hereby confirmed in accordance with §§ 1129 and 1141 of the Bankruptcy Code.

It is further **ORDERED, ADJUDGED AND DECREED** that entry of this Confirmation Order shall constitute approval, pursuant to § 105(a) of the Bankruptcy Code, effective as of the Effective Date, of the substantive consolidation of the Debtors' Estates and upon the Effective Date, the Estates shall be deemed substantively consolidated for purposes of the Joint Plan.

It is further **ORDERED, ADJUDGED AND DECREED** that, without further order of the Court, Debtors are authorized and empowered to execute, deliver, file or record such contracts, instruments, releases, and other agreements or documents and take all actions and perform all acts, including expending funds, reasonably necessary or appropriate to consummate, effectuate, implement and further evidence the terms, conditions and intent of the Joint Plan. The terms and provisions of the Joint Plan, a copy of which is attached as **Exhibit A**, are binding on Debtors, all their creditors, all parties in interest, and all their equity security holders affected thereby.

It is further **ORDERED, ADJUDGED AND DECREED** that this Court expressly retains jurisdiction to the extent necessary to modify this Confirmation Order or enter a supplemental order.

7

It is further **ORDERED, ADJUDGED AND DECREED,** that in accordance with the
Joint Plan and except as otherwise specifically provided for in the Joint Plan or in this
Confirmation Order, the rights afforded in the Joint Plan and the payments and distributions to be
made hereunder shall be in exchange for and in complete satisfaction, release and discharge of
all existing debts and Claims, and terminate all Equity Interests of any kind, nature or
description, whatsoever, against or in Debtors' Estate or any of their assets or properties to the
fullest extent permitted by § 1141 of the Bankruptcy Code. Except as otherwise provided herein
or in the Joint Plan, upon the Effective Date, all existing Claims against the Estate shall be, and
shall be deemed to be, discharged and terminated, and all holders of Claims and Equity Interests
shall be precluded and enjoined from asserting against the Estate, or any of its assets or
properties, any other or further Claim or Equity Interest based upon any act or omission,
transaction or other activity of any kind or nature that occurred prior to the Effective Date,
whether or not such holder has filed a proof of Claim or Interest or is listed in the Schedules.

It is further **ORDERED, ADJUDGED AND DECREED**, that Debtors pay to the United
States Trustee the appropriate sum required pursuant to 28 U.S.C. §1930(a)(6) on the Effective
Date of the Plan and continue to make timely payments to the U.S. Trustee pursuant to 28 U.S.C.
§1930(a)(6) for all periods up to the date the case is converted, dismissed, or closed by Court
Order, and Debtors shall provide an appropriate affidavit indicating the cash disbursements for
the relevant calendar quarters until the case is converted, dismissed, or closed by Court Order.

It is further **ORDERED, ADJUDGED AND DECREED,** that pursuant to the authority
of this Court granted under Bankruptcy Rule 3020(e), this Confirmation Order shall not be
stayed until the expiration of fourteen (14) days after entry of this Confirmation Order and shall
be effective immediately upon its entry.

8

Debtors' counsel

It is further **ORDERED, ADJUDGED AND DECREED**, upon entry, ~~the Clerk~~ shall

per

forward a copy of this Confirmation Order to those persons listed on the attached List of Parties

to Receive Copies.

ENTERED: March 16, 2016     By the Court: _____

United States Bankruptcy Judge

I ASK FOR THIS:

/s/Maureen T. Bass_____
Maureen T. Bass, Esq.
*Attorneys for Debtors*

9

# CRONMILLER DECLARATION
# EXHIBIT "B"

**IN THE UNITED STATES BANKRUPTCY COURT
IN THE NORTHERN DISTRICT OF NEW YORK
ALBANY DIVISION**

———————————————————————

In re                                                            Chapter 11

TURKEY LAKE, LLC, *et al*,                      Case No.:  15-12091 (REL)

                                    Debtors          (Jointly Administered)

———————————————

ANTHONY GIORDANO, TRUSTEE,

                                    Plaintiff,

v.

RIZZO, DIGIACCO, HERN & BANIEWICZ
CPAS, PLLC

                                    Defendant.


———————————————————————


**EXPERT REBUTTAL REPORT**

**OF**

**JAMES I. MARASCO, CPA/CFF, CFE, CIA**

**DATED**

**December 2, 2020**

**EXPERT REBUTTAL REPORT**

**OF**

**JAMES I. MARASCO, CPA/CFF, CFE, CIA**

**DATED**

**December 2, 2020**

**INDEX**                                                                                          **Page Number**

I.      Introduction/Background/Timeline of Events ................................................................ 3
II.     Assignment ................................................................................................................... 6
III.    Opinion ........................................................................................................................ 7
IV.     Sources of Information ................................................................................................. 7
V.      Limitations, Assumptions and Other Points Concerning Opinions In This Report........... 8
VI.     Statement of Opinions and Bases for Them ................................................................. 8
VII.    Qualifications …………………………………………………………………………24

**EXHIBITS**

Appendix A – Curriculum Vitae – James I. Marasco, CPA/CFF, CIA, CFE

## I.      Introduction/Background/Timeline of Events

In 2011, Ted Naylon ("Mr. Naylon" or "the Seller") was the 100% owner of six laser spas ("Spa Entities"): Cleveland Laser Spa, LLC, an Ohio limited liability company ("Cleveland, LLC"); Columbus Laser Spa, LLC, an Ohio limited liability company ("Columbus LLC"); Lexington Laser Spa, LLC a Kentucky limited liability company ("Lexington LLC"); Nashville Laser Spa, LLC, a Tennessee limited liability company ("Nashville LLC"); Syracuse Laser Spa LLC, a New York limited liability company ("Syracuse LLC"); and, Albany Laser Spa, Inc. ("Albany, Inc.").[1] Mr. Naylon desired to sell the Spa Entities and, in December 2011, he entered into a non-exclusive Finder's Agreement ("FA") [2] with Rizzo, DiGiacco & Hern, CPA's PLLC ("Rizzo") to act as a finder in connection with introducing its clients and other interested parties who may be interested in engaging in the purchase of some or all of the assets of the Spa Entities.

In 2011, Rizzo introduced Michael Linehan ("Mr. Linehan" or "the Buyer") to Mr. Naylon.  Mr. Linehan was interested in purchasing some of the assets of the SPA Entities.  In June 2012, Mr. Linehan entered into a Membership Interest Purchase Agreement ("the Purchase Agreement") to purchase a 50% membership interest in Turkey Lake, LLC for $4.0 million. [3]   The Purchase Agreement stated that the Buyer would provide a closing certificate acknowledging that, "Buyer believes he has received all the information he considers necessary or appropriate for deciding whether to go forward with his purchase of the membership interests of the Holding Company," [4] and "he had an opportunity to ask questions and receive answers from the Seller and the Seller's representatives regarding the Spa Entities and the offering of the Holding Company." [5]

The Purchase Agreement stated that the Buyer had previously been provided the following financial statements: Albany, Inc.-period from January 1, 2010 through December 31, 2011; Syracuse LLC-period from May 1, 2010 through December 31, 2011; Nashville LLC-period from May 1, 2011 through December 31, 2011; Columbus LLC-period from November 1, 2011 through

---

[1] Membership Interest Purchase Agreement ("Purchase Agreement"), dated June 2012.
[2] Finder's Agreement ("FA"), effective December 2011.
[3] Purchase Agreement, p. 2, Section 1.2.
[4] Ibid., p. 3, Section 2.2 (b).
[5] Ibid.

December 31, 2011; and Cleveland LLC-period from January 1, 2011 through December 31, 2011 and for the three month period ending March 31, 2012 for each of the Spa Entities operating during these periods.  Lexington LLC's business operations have not yet started except for initial set up costs. [6]  Except as set forth in Section 3.1 (k) of the Disclosure Schedule, the Spa Entities have no liabilities of any nature required to be reflected on or reserved against in the financial statements.[7]

Schedule 3.1 (h)(i) of the Purchase Agreement states that "the Seller is subject to a finder's agreement with Rizzo, DiGiacco & Hern, CPA's ("Rizzo").  Seller is responsible for payment of the finder's fee to Rizzo."  Rizzo was paid a finder's fee of $200,000 for this transaction. [8]

Schedule 3.1(k)(i) of the Purchase Agreement states that, "The Company has deferred revenues for prepayments (deposits) received but services not yet performed.  The Amount has not been calculated on the financial statements since financials are on a cash basis method of accounting, and this will be an unpaid obligation of the Company after Closing." [9]  The transaction closed on August 24, 2012, [10] with MPL Funding LLC ("MPL"), [11] an entity owned by Michael Linehan, purchasing the 50% interest.

Before closing on the transaction with Mr. Naylon, Mr. Linehan hired Bonadio & Co., LLP ("Bonadio") to perform financial due diligence related to the potential transaction.  As part of the due diligence, Bonadio notified Mr. Linehan that the financial statements were prepared on a cash basis and that the Company's accountants were receiving a finder's fee based on a percentage of the purchase price that he was acquiring. [12]  Bonadio further notified Mr. Linehan that there was deferred revenue that was not recorded on the financial statements of the Spa Entities and that working capital should be left in the business. [13]  Mr. Linehan informed Mr. Naylon of the deferred revenue finding on July 13, 2012 and Mr. Naylon acknowledged that the entities had deferred

---

[6] Finder's Agreement, p. 7, Section 3.1 (k).
[7] Ibid.
[8] Per Finder's Agreement, Rizzo was paid 5% of purchase price.
[9] Purchase Agreement, Schedule 3.1 (k)(i)
[10] 2012 TL financial statements
[11] 2012 U.S. Return of Partnership Income
[12] Laserspa, Due Diligence Summary of Findings, August 6, 2012, prepared by Bonadio & Co., LLP ("Bonadio Report"), p. 3.
[13] Bonadio Report, p. 4.

4

revenue, that it was no surprise and no adjustments would be made under the terms of the Purchase Agreement. [14]

Prior to the issuance of its report, Bonadio informed Mr. Linehan of the complexity of recording deferred revenue. [15] Further, Mr. Linehan was aware that deferred revenue could be as high as $4 million on August 18, 2012. [16]

Prior to closing of the transaction with Mr. Linehan, Mr. Naylon converted Albany, Inc. to a limited liability company and formed a holding company, Turkey Lake, LLC ("TL" or "Holding Company"), which became the 100% owner of all of the SPA Entities.  Initially, Mr. Naylon was the sole member of TL. [17]

According to the Salomon report, in November 2013, MPL purchased an additional 15% membership interest in TL for $1,170,000 and Rizzo was due an additional finder's fee of $58,500, with $29,250 paid at closing and the balance to be paid in equal installments of $9,750 each on October 31, 2014, 2015 and 2016.  On May 1, 2014, Mr. Naylon purchased back 10% of MPL Funding's interest for $780,000. [18]

Rizzo performed accounting and tax services for TL, as it had for the SPA entities prior to its formation.  These services included the following: compiled financial statements for 2012 and the seven months ended July 31, 2013 [19]; reviewed financial statements for 2013 and 2014; [20] and tax return preparation for 2012, 2013 and 2014. [21]

Mr. Linehan was the CEO of TL. [22]  He engaged Rizzo for compilation and review engagements.[23] He signed the Management Representation Letters for the review engagements in 2013 and 2014

---

[14] Emails between Mr. Linehan and Mr. Naylon, July 13, 2012.
[15] Email from Michael Parrinello to Michael P. Linehan, Jeff DeVoesick and Bruce B. Zicari, August 21, 2012.
[16] Emails from Mr. Linehan to Michael Parrinello, Jeff DeVoesick and Jordan Morgenstern, August 18, 2012.
[17] Purchase Agreement, p. 2.
[18] Salomon Report, p. 34.
[19] Financial Statements compiled by Rizzo, year ended December 31, 2012 and 7 months ended July 31, 2013.
[20] Financial Statements reviewed by Rizzo, year ended December 31, 2013 and 2014
[21] U.S. Returns of Partnership Income for the years 2012 - 2014, prepared by Rizzo.
[22] 2013 Review Engagement Letter.
[23] 2013 Review Engagement Letter and 2014 Review Engagement Letter.

and he signed the tax returns for TL in 2012, 2013 and 2014.  He further oversaw the operations and expansion of TL in 2012 through October 20, 2015 and, in the first quarter of 2015, TL hired Ronald S. Castor of JC Jones as a consultant. [24]  In August 2015, Mr. Castor accompanied Mr. Linehan to a meeting at Genesee Regional Bank to explain TL's business challenges.  A business day later after that meeting Genesee Regional Bank froze TL's operating account. [25]

On October 20, 2015, TL filed a Chapter 11 bankruptcy petition with the U.S. Bankruptcy Court, Northern District of New York (Albany). [26]  On October 20, 2017, the bankruptcy Trustee, Anthony Giordano ("Plaintiff"), filed a complaint against Rizzo ("Defendant") alleging negligence, accountant malpractice, breach of fiduciary duty, negligent misrepresentation, breach of contract and unjust enrichment. [27]  The Plaintiff engaged two financial experts (Mr. Ronald S. Castor and Mr. John I. Salomon) to support their action against the Defendant and their reports were each issued on October 8, 2020.

## II.    Assignment

I was retained by Barclay Damon, LLP to provide an evaluation of the Plaintiff's claims of accounting malpractice, proximate causation and financial damages.  As noted above, Plaintiff's Experts, each issued their reports ("Castor Report" and "Salomon Report") on October 8, 2020.

I have reviewed the methodologies and approaches used by Mr. Castor and Mr. Salomon and offer the opinions in this report in rebuttal.  My assignment in this matter, as a forensic accountant, is to review the underlying records and methodology supporting the process and procedures used by the Plaintiff's Experts to generate the alleged damages.  I have not audited in accordance with generally accepted auditing standards any financial information or other documents considered in reaching my opinions in this report.

---

[24] Castor Report, page 5.
[25] Ibid.
[26] United States Bankruptcy Court, Northern District of New York, Chapter 11, Case No. 15-12091.
[27] Summons and Complaint, TL and Giordano, Trustee vs. Rizzo, United States Bankruptcy Court for the Northern District of New York, Albany Division, Chapter 11, Case No. 15-12091.

My firm, StoneBridge Business Partners, is being compensated at a rate of $300 per hour for the time I spend on this assignment. Part of the work was performed by others under my direction and supervision. Charges for staff members involved in this assignment have been billed at rates ranging from $105 - $215 per hour. The compensation for our time is in no way contingent upon the outcome in this litigation. I reserve the right to update my analyses should new information become available.

## III.    Opinion

Overall Opinions

Based on the analyses and procedures I performed, it is my opinion that the Plaintiff Experts' Reports grossly overstate any alleged damages suffered by TL in this matter, to the extent any exist. Their reports are inaccurate, unreliable and fail to display how Rizzo's involvement with TL led to their bankruptcy, let alone any possible financial damages suffered. The Plaintiff's alleged damages, along with my analyses and responses for each component of their reports, are described in the detail that follows.

## IV.    Sources of Information

My analysis was based on information obtained from Barclay Damon, LLP, Defendants' Counsel. The specific information and documents I considered in reaching my opinions, which are provided in this report, are listed below. It is my understanding that this information has already been provided in discovery.

- ❍ Summons and Complaint, in the United States Bankruptcy Court for the Northern District of New York, Albany Division, Chapter 11, Case No. 15-12091.

- ❍ United States Bankruptcy Court Northern District of New York, In re: Turkey Lake, LLC, et al., Debtors. Chapter 11, Case No. 15=12091 (REL) (Main Case), Jointly Administered, Disclosure Statement for Turkey Lake, LLC, et al, for Chapter 11 Plan of Reorganization.

- ❍ Expert Report of Ronald S. Castor, dated October 8, 2020.

- ❍ Expert Report of John I. Salomon, dated October 8, 2020.

- ❍ Membership Interest Purchase Agreement, dated June 2012, between Michael Linehan and Ted Naylon.

❍   Member Operating Agreement – Turkey Lake, LLC, dated 2012.

❍   Finder's Agreement, dated December 2011, between Edward Naylon and Rizzo, DiGiacco & Hern, CPA's, PLLC.

❍   Finder's Agreement Termination Letter from Mr. Naylon to Rizzo, June 26, 2012.

❍   LaserSpa Due Diligence Summary of Findings, dated August 6, 2012, prepared by Bonadio & Company, LLP

❍   U.S. Returns of Partnership Income for Turkey Lake, LLC for 2012-2014, prepared by Rizzo, Digiacco, Hern & Baniewicz, PLLC.

❍   2012 Compilation Engagement Letter for Turkey Lake, LLC

❍   2012 Financial Statements, compiled by Rizzo, DiGiacco, Hern & Baniewicz, PLLC.

❍   July 2013 Financial Statements, compiled by Rizzo, DiGiacco, Hern & Baniewicz, PLLC.

❍   2013 Review Engagement Letter for Turkey Lake, LLC

❍   2013 Financial Statements, reviewed by Rizzo, DiGiacco, Hern & Baniewicz, PLLC.

❍   2013 Representation Letter for review engagement

❍   2014 Review Engagement Letter for Turkey Lake, LLC

❍   2014 Financial Statements, reviewed by Rizzo, DiGiacco, Hern & Baniewicz, PLLC.

❍   2014 Representation Letter for review engagement.

❍   GRB Loan Minutes, Dave Halladay Deposition Exhibits, March 29, 2019.

❍   Various email correspondence as referenced in the footnotes of this report.

## V.        Limitations, Assumptions and Other Points Concerning Opinions In This Report

This report includes the opinions I have formed based on my review of the documentation supplied. I understand that any additional information provided to me may impact my analysis. Because of the potential additional information, my analysis may be amended, but the opinions presented are not expected to change. Therefore, I may provide supplements to this report.

## VI.       Statement of Opinions and Bases for Them

The expert report of Ronald S. Castor is unreliable and inaccurate and should not be given any consideration for this proceeding.

The expert report of Ronald Castor doesn't qualify as an expert report and reads more like an affidavit of unsubstantiated opinions, most of which are in direct contrast to the actual facts of this matter. For example, I highlight the following inconsistencies or inaccuracies:

- Mr. Castor identifies himself as a "turnaround professional" [28] and the recipient of an award for the 2018 Turnaround/Transaction of the Year from the M&A Advisory for his work done in connection with TL. [29] However, the Salomon Report alleges the value of TL went to zero by early 2016. [30] What achievement in this engagement could warrant Mr. Castor such an award unless there is more value to be considered that has gone undisclosed by these two experts?

- In the first quarter of 2015, Mr. Castor stated he became involved with TL. [31] At the time of their engagement, Mr. Castor notes TL was experiencing cash flow issues and the owners were surprised because they understood TL to be a profitable company. [32] Mr. Castor states TL was not a financially secure company based on three factors: 1) TL's extensive debt, 2) aged payables, and 3) seemingly unprofitable growth. [33] It seems alarming that the two owners needed to retain a turnaround expert to tell them the obvious. Further concerning, in May 2015, Mr. Castor expressed his opinions about the financial strength of TL to Mr. Linehan and he replied he was skeptical because Mr. Rizzo assured him TL was financially sound. [34] Mr. Castor helps disprove his own theory about culpability in his statement, "In my opinion, at the time, Mr. Linehan did not understand TL's financial position, or the financials and the true effect of the improper recognizing of revenue contained in TL's financial statements. [35]

---

[28] Castor Report, p. 2.
[29] Ibid, p. 2.
[30] Salomon Report, p. 35.
[31] Castor Report, p. 2.
[32] Ibid, p. 3.
[33] Ibid, p. 3.
[34] Ibid, p. 4.
[35] Ibid, p. 5.

- Further to that point, Mr. Castor appears to have been re-engaged by TL in August 2015 when Mr. Linehan advised him that TL was again experiencing cash flow problems because its revenue had dipped. [36]  Revenue dipping is a significant issue for a rapidly expanding company and a strong indicator that something is amiss, which doesn't involve Rizzo's financial reporting or the disclosure of deferred revenue, all of which must have already been communicated to TL management by Castor in his earlier engagement.

- Mr. Castor's depiction of the Genesee Regional Bank ("GRB) sequence of events is misleading and inaccurate.   According to Mr. Castor, "at around the same time" (presumably August 2015 based on how it is written), he accompanied Mr. Linehan to a meeting at the bank "to explain TL's business challenges, as well as disclose the issues with the financial statements (the exclusion of deferred revenue).  A business day later after that meeting, GRB froze TL's operating account and with the operating account frozen and an inability to pay employees, TL filed an emergency Chapter 11 bankruptcy proceeding." [37] In Mr. Giordano's deposition (TL Bankruptcy Trustee), he testified Mr. Linehan, Mr. Castor and himself went to GRB's offices in October 2015 because they "felt that it was prudent to give them notice prior to filing that we intended to file." [38]  This is a complete contrast of Mr. Castor's portrayal of the events.  It seems more likely the meeting actually took place in October (versus August) since the bankruptcy filing occurred on October 20, 2015.  What "issues" and what financial statements was Mr. Castor allegedly disclosing to GRB at that time?  By that time, he had been working with TL for over half a year and management (including Mr. Linehan) was well aware of the existence of deferred revenue since his original investment in 2012.  Based on these circumstances, it appears both the owners and Mr. Castor never felt obligated prior to the eve of their bankruptcy filing to notify GRB of their operating challenges or the existence of a deferred revenue liability.

- Finally, Mr. Castor closes out his litany of unsubstantiated opinions with, "TL lost business value because it expanded too fast by management making erroneous operating decisions

---

[36] Castor Report, p. 5.
[37] Ibid.
[38] Deposition Testimony of Anthony Giordano, dated December 17, 2018, p. 32.

relying on advice and financial statements indicating profitability.  These decisions created an unsustainable cost structure that eventually caused the company to run out of cash and was forced to file an emergency bankruptcy." [39]  Although a self-proclaimed "turnaround expert", Mr. Castor failed to attribute blame to the most obvious parties, including himself. During 2013, while the Company was trying to rapidly grow, the owners of TL took nearly $1.5M out of the business themselves as distributions, along with taking shareholder loans and advances.  They owed nearly $600k on credit cards and also spent $4M or 30% of their reported revenues on advertising alone.  This should be alarming for any business owner, regardless of the deferred revenue issue.

In regards to Mr. Castor, he stated he started working with them in early 2015 and presumably would have disclosed or communicated all of the above issues to management before finishing up his first stint in May.  Yet the Company never improved and was forced to file bankruptcy in late October and subsequently liquidate.

<u>The expert report of John L. Salomon contains incorrect interpretations of accounting standards and fails to substantively prove how any possible negligence that can be attributed to the Defendants led to financial damage or harm to the Plaintiff.  Further, he is not qualified to opine on any financial damages that may have occurred, if they could be proven.</u>

In the Salomon Report, Mr. Salomon identifies four critical areas: 1) Lack of independence, 2) Deferred Revenue, 3) Going Concern, and 4) Damages.   Below is a description of the work I performed and the conclusions I reached in my analysis on each of the issues identified by Mr. Salomon:

1.  <u>Independence was not impaired</u>

   Mr. Salomon states that Rizzo appears to impair independence, due to the FA and that Rizzo lacked independence due to the continuing contingent nature of the payments under FA. [40] He further states that Rizzo's Titling his Accountant's Report as, "Independent Accountant's

---

[39] Castor Report, p. 6.
[40] Salomon Report, p. 21.

Report", is misleading in the compilation and review reports issued by Rizzo. [41]  Mr. Salomon also notes that Rizzo failed to act with competence and due care in completing their independence checklist. [42]  Mr. Salomon's assertions are incorrect for the following reasons:

- The American Institute of Certified Public Accountants' (AICPA) Professional Code of Conduct states that, "If the member believes that the professional service can be performed with objectivity, and the relationship is disclosed to and consent is obtained from such client, employer, or other appropriate parties, the rule shall not operate to prohibit the performance of the professional service." [43]  Mr. Naylon and Rizzo entered into the FA before TL was formed.  Additionally, the FA was disclosed in the Purchase Agreement that both Mr. Naylon and Mr. Linehan signed, and in the Bonadio Report. With this understanding, the members of TL knowingly engaged Rizzo for compilation and review services.

- TL was not a party to the Finder's Agreement.  Moreover, the copy of the AICPA's Code of Professional Conduct that was included in the Salomon Report included language with regard to affiliates that was not effective until January 1, 2014. [44] Therefore, TL cannot be considered a party to the FA until 2014.  However, in a June 26, 2012 communication, Mr. Naylon informed Rizzo he was terminating the Finder's Agreement which was effective 60 days after the date of termination. [45]

Another complicating factor to this arrangement is that in 2014, Mr. Naylon repurchased 10% of MPL Funding's ownership interests, effectively rendering any amounts due Rizzo null and void.  Rizzo confirmed to Counsel that he was never paid any of the scheduled installments that were originally discussed.  Therefore, Rizzo was independent in 2012 - 2014, the years that it performed compilation and review services for TL.

---

[41] Salomon Report, p. 22.
[42] Ibid.
[43] AICPA Code of Professional Conduct ET 102/.
[44] AICPA Code of Professional Conduct, ET Section 101.20 101-18, p. 2895.
[45] Finder's Agreement Termination Letter from Mr. Naylon to Rizzo, June 26, 2012.

- Since Mr. Salomon is not a practicing public accountant, he obviously is not aware that all accountant reports need to be titled, "Independent Accountant's Review or Compilation Report", whether or not the accountant is actually independent of the client. [46] If the accountant is not independent of the client, it is noted within the body of the report, but the title remains intact.

2. <u>The members of TL and their advisors knew about deferred revenue ("DR") and had a responsibility to disclose it.</u>

Mr. Salomon states that the Rizzo firm knowingly allowed TL to record deferred revenue as revenue on its income statements instead of as a liability on its balance sheets. The Salomon Report goes on to say that Rizzo included in their Compilation Reports that TL management was presenting its financial statements in conformity with GAAP. Rizzo had the obligation to inform management of any material errors during the performance of the compilations thus violating the professional standards of competency and due care. [47] The Salomon Report further states that Rizzo knew DR was material [48] and that Rizzo failed to perform compilations in accordance with SSARs (Statements on Standards for Accounting and Review Services) and failed to issue correct Compilation reports. [49] Mr. Salomon also mentions that John Rizzo emailed 2011 and 2012 profit and loss statements to one of TL's landlords and Rizzo sent similar reports to Bank of America. All financial statements explicitly stated at the top of the financial statements that they were prepared on an "Accrual Basis" - thus, Rizzo violated the professional standards of due care, integrity and objectivity. [50] Rizzo also violated the same standards according to Mr. Salomon when he sent out the December 31, 2013 reviewed financial statements to third parties in a June 3, 2014 correspondence. [51]

The Salomon Report neglects to disclose all of the facts with regard to deferred revenues ("DR"). By selectively choosing what to report, he misleads and arrives at false conclusions as illustrated below:

---

[46] Statements on Standards for Accounting and Review Services, Section 90.28.
[47] Salomon Report, p. 25.
[48] Ibid, p. 26.
[49] Ibid, p. 27.
[50] Ibid, pp. 27-28.
[51] Ibid, p. 28.

- Both owners and Bonadio knew about DR and knew that the financial statements were prepared without reflecting it.

  o "The Company prepares its financial statements on a cash basis, which is different than the accrual basis of accounting in accordance with accounting principles generally accepted in the United States of America ("US GAAP"). The Company's financial information is not compiled, reviewed or audited. The Company's accountants provide bookkeeping services based on information provided by the Company and also prepare the tax returns for the LaserSpa Entities." [52]

  o "It may be a worthwhile conversation to modify the terms of the Membership Agreement to include for a normal level of working capital to be left in the business rather than advances and distributions by one member subsequent to the closing. If this is not possible, Turkey Lake may want to consider treating the advances as loans, with the appropriate documentation, rather than contributions and corresponding distributions so as not to encumber the tax accounting for such transactions." [53]

  o "It was communicated to us that certain customers of the LaserSpa Entities will pay for a series of treatments in advance of receiving those treatments. Because LaserSpa is on the cash basis, these advance payments have been included in revenue rather than having been deferred until the service was performed as would be required under the accrual basis. It has been noted that some of these services will be performed subsequent to the closing and therefore costs will be incurred without the benefit of the revenue generated as the cash will be distributed out of the business. This fact only serves to strengthen the argument for the requirement

---

[52] Bonadio Report, p. 3.
[53] Bonadio Report, p. 4.

of some working capital being left in the business prior to your investment." [54]
(relates to statement in bullet directly above)

  o  "As noted in our observations and findings, we found that the recordkeeping of
     the LaserSpa Entities to be in satisfactory condition and that amounts recorded
     were done so in accordance with the cash basis and agreed to the transactions
     included in the native documentation (bank statements and credit card
     statements)." [55]

- The owners who entered into banking transactions had the obligation to tell the
  bankers about the unrecorded liabilities.  Further, contrary to Mr. Salomon's assertion
  on page 28 of his report, the 2013 review financial statement actually disclosed the
  existence of deferred revenue and that revenues were recognized before services were
  performed.

- The QuickBooks reports for 2011 and 2012 were not compiled or reviewed by Rizzo.
  Because they said "accrual" does not mean that the financials have been prepared
  according to GAAP.  They are internally generated, management financial statements
  forwarded by Rizzo.

- While the December 2012 and July 2013, Rizzo-issued compiled financial statements
  should have included a GAAP disclosure involving DR, management signed the
  compilation engagement letter on September 30, 2013 for these services, which clearly
  states that management is responsible for the preparation and fair presentation of the
  financial statements in accordance with accounting principles generally accepted in
  the United States of America.  This letter was signed by Michael Linehan, as Owner
  of TL. [56]  The Compilation Report clearly states, "The objective of a compilation is to
  assist management in presenting financial information in the form of financial

---

[54] Bonadio Report, p. 4.
[55] Ibid, p. 6.
[56] Compilation Engagement letter, dated September 30, 2013.

statements without undertaking to obtain or provide any assurance that there are no material modifications that should be made to the financial statements." [57]

- The engagement letter for the 2013 review also states that management is responsible for the preparation and fair presentation of the financial statements in accordance with accounting principles generally accepted in the United States of America. This letter was signed by Michael Linehan, as Owner of TL. [58]

- Further, management provided a representation letter for the 2013 review, which stated that, "The financial statements referred to above are fairly presented in accordance with accounting principles generally accepted in the United State of America." [59] The letter further states, "No material transactions exist that have not been properly recorded in the accounting records underlying the financial statements."[60] This letter was signed by Michael Linehan, as Owner of TL." [61]

- The engagement letter for the 2014 review also states that management is responsible for the preparation and fair presentation of the financial statements in accordance with accounting principles generally accepted in the United States of America. This letter was signed by Michael Linehan, as CEO for TL. [62]

- Management provided a representation letter for the 2014 review financial statements, which stated that, "The financial statements referred to above are fairly presented in accordance with accounting principles generally accepted in the United States of America." [63] The letter further states, "No material transactions exist that have not

---

[57] 2012 Compiled Financial Statements. Independent Accountants' Compilation Report
[58] 2013 Review Engagement letter, dated March 17, 2014.
[59] Management Representation Letter, dated March 20, 2014.
[60] Ibid.
[61] Ibid.
[62] 2014 Review Engagement letter, signed March 6, 2015.
[63] 2014 Management Representation Letter, dated September 10, 2015.

been properly recorded in the accounting records underlying the financial statements."[64] This letter was signed by Michael Linehan, as CEO of TL." [65]

- GRB expanded TL's line of credit in July 2014 from $1M to $2.3M. [66] According to the minutes from the increase request, the bank had been given the 2013 TL review financial statement which included the deferred revenue GAAP departure disclosure. However, nowhere in the minutes does the analyst or bank loan committee members inquire about the specifics of the disclosure or any mention of management disclosing it to the bank.

In summary and as confirmed in Mr. Salomon's expert report, management and their respective advisors knew from at least 2011/2012 that the financial reporting did not include an adjustment for possible deferred revenue liabilities. Management alone made the decision to invest and rapidly expand their business. Mr. Linehan and his Controller, Michelle Trick, both represented in writing that the 2013 reviewed financial statements did not contain any unrecorded material financial transactions and never disclosed the deferred revenue liability to their primary lender, while requesting more money from the bank.

3. Going concern consideration did not impact the financial statements, nor did it lead to the demise of the Business.

The Salomon Report states that "Rizzo violated standards of due care and competency and SSARs when they did not consider the going concern principle with respect to their review of TL's financial statements for the period ended December 31, 2013." [67] The Salomon Report also states that "Rizzo violated professional standards of due care and competency and SSARS when they did not consider the going concern principle with respect to their review of TL's financial statements for the period ended December 31, 2014. TL disclosed a $6.4 million deferred revenue balance in its financial statements for that period…" [68] "The effects of the recording of deferred revenue and the operating loss for the year should have caused Rizzo to

---

[64] 2014 Management Representation Letter, dated September 10, 2015.
[65] Ibid.
[66] GRB Loan Minutes, Dave Halladay Deposition Exhibits, March 29, 2019, p.2.
[67] Salomon Report, p. 29.
[68] Ibid, pp. 30 - 31.

address the issue of going concern." [69]   The Salomon Report finishes this section by stating, "Less than ten months following the financial statement date of December 31, 2014, and less than two months following the issuance of the financial statements, TL filed for bankruptcy protection in October 20, 2015." [70]

It is my opinion that Rizzo's consideration of the going concern principle would have had no impact on TL or its continued existence.   Further, Mr. Salomon is again trying to apply incorrect accounting standards to this matter as noted below:

- The time period for evaluating an entity's ability to continue as a going concern is a "reasonable period of time, not to exceed one year beyond the date of the financial statements being reviewed.   In those circumstances, the accountant should request that management consider the possible effects of the going concern uncertainty on the financial statements, including the need for related disclosure." [71]   For 2013, Rizzo likely did not consider the going concern principle applicable.   Deferred revenue had not been determined.   The financial statements for the year ended December 31, 2013 reflected $1.8 million in net cash provided from operating activities.   Additionally, management had historically left minimal working capital in the business, as evidenced by their 2013 salary/distributions totaling nearly $1.5M paid to themselves.   Finally, TL remained in operation for over a year past the December 31, 2013 balance sheet date of the financial statements, proving that they were not a going concern at that time.

- Mr. Salomon stated that Rizzo should have included a paragraph of emphasis that a going concern uncertainty existed at December 31, 2013 balance sheet date. [72] However, since the 2013 financial statements did not include a disclosure of uncertainty, a paragraph of emphasis is not applicable.   "The accountant may emphasize an uncertainty about an entity's ability to continue as a going concern, provided that the uncertainty is disclosed in the financial statements." [73]

---

[69] Salomon Report, p. 31.
[70] Salomon Report, pp. 31 - 32.
[71] AR 90.47.
[72] Salomon Report, p. 30.
[73] AR 90.50.

- TL's 2014 financial statements included a $6.4 million deferred revenue liability on their balance sheet. It is important to note that deferred revenue is a non-cash entry, that is, it does not impact the cash flow of the Company. As reflected on the 2014 cash flow statement, cash flow from operations was positive, at $225,813, and cash and cash equivalents for the year increased by $187,313. [74] Moreover, a closer look at the 2014 financial statements reveals that TL expended $7.1M in advertising expense, $1.1M in guaranteed payments/distributions to members and $382,000 in travel expenses during the year that could have been cut back if the Company expected a cash shortfall. Historically, it was the modus operandi of TL to finance the growth with short-term funding and drain the working capital from the company (as evidenced by their owner distributions in excess of $2.6M in 2013 - 2014).

Mr. Salomon helps support my conclusion in his own expert report on page 32, "..less than two months following the issuance of the financial statements, TL filed for bankruptcy protection on October 20, 2015." Whether Rizzo disclosed a going concern in the 2014 reviewed financial statement or not, they filed bankruptcy shortly thereafter. Hopefully, TL and its owners weren't waiting for a financial statement (issued 8 ½ months after year end), to tell them that they weren't financially sound and should shut down. During 2014 alone, per the 2014 financial statement footnotes, the owners loaned nearly $450,000 to TL. Mr. Castor, the turnaround expert, had been working with them since early 2015 to improve or sell their business. It is my opinion that Rizzo's lack of consideration of the going concern principle disclosure in the 2014 financial statement had no impact on TL or their continued existence.

4.  <u>The Plaintiff's claim for damages is flawed and unsupported.</u>

The Salomon Report claims that TL incurred damages resulting from the reliance on services provided by Rizzo, with Mr. Naylon testifying to his reliance on John Rizzo and the Rizzo firm and Mr. Linehan testifying to his reliance on the Rizzo firm. [75] The Salomon Report also

---

[74] 2014 Financial Statements.
[75] Salomon Report, p. 32.

claims that, TL embarked on the significant expansion of the business. In order to finance this expansion, TL increased their available financing through its senior lender (GRB) and Bank of America. If it were not for Rizzo's failure in performing its compilation and review services to TL and Rizzo's violations of professional standards, TL would not have been able to over expand its business or execute as many new leases. This over expansion led to additional losses. [76] Finally, the Salomon Report claims that the measure of damages in this matter is the difference between the fair market value of the membership interest in Turkey Lake prior to its over expansion and its fair market value after the Bankruptcy. This difference results in a diminution of value. [77]

Mr. Salomon goes on to state that the damages incurred by the Trustee are between $7.8M and $8.0M dollars, based on the transactions in TL stock in 2012 to 2014, compared with a value of zero after bankruptcy on January 22, 2016. [78]

Not only is Mr. Salomon not qualified to opine on the value of TL, his conclusions on damages are erroneous for the following reasons:

- Mr. Salomon neglected to consider other factors that contributed to TL's bankruptcy:

  o Deferred revenue arises when a customer pays for services that are provided over a period of time. In the case of TL, services were provided over 8 months. [79] Therefore, as deferred revenue increased, cash would have also increased. The cash deposits could have been used to pay for future services that TL was obligated to provide. Instead, management chose to spend the cash before "earning it," which negatively impacted the Company's cash flows. In 2013, TL spent $4.0M on advertising and $1.5M on guaranteed payments/salary to members. In 2014, TL spent $7.1M on advertising, $1.1M on guaranteed payments/distributions to members and $382,000 on travel. Bonadio had advised Mr. Linehan back in 2012 to leave working capital in the business

---

[76] Salomon Report, p. 33.
[77] Ibid.
[78] Salomon Report, pp. 34 - 35.
[79] Mr. Linehan email to Mr. Naylon, July 13, 2012.

to fund operations. [80]    Instead, Mr. Linehan and Mr. Naylon chose to ignore these recommendations, pay themselves significant distributions and spend extensive amounts of money on controllable expenses such as advertisement and travel.

o   TL expanded, adding 10 locations in 2013, using cash from operations, including $424,000 on credit cards, and drawing out $575,000 on their line of credit.  This expansion occurred prior to Rizzo issuing review financial statements.  Consequently, the initial decision to expand was unrelated to Rizzo's review financial statements.  Additionally, management was aware of DR, yet clearly made poor decisions by draining TL of cash and utilizing a short-term line of credit to help finance the purchase of $2.3M in property and equipment, which are long-term assets.

o   TL further expanded and added 9 additional locations in 2014, financing its $1.8M in property and equipment with additional borrowings on its line of credit.  Once again, long-term assets were financed with short-term debt.  This issue was also discussed in GRB's loan committee minutes of October 25, 2013 when committee member Mr. Hogan stated, "the Line of Credit was an unusual request for funding expansion.  Mr. Murray (GRB staff member) stated that the stores are so profitable that any draws for new store openings would be repaid within one year." [81]

Management's decisions cannot be blamed on its outside accountant, when both Mr. Naylon and Mr. Linehan were aware in 2012 that deferred revenues were $4.0 million.[82]  Given the business expansion, the owners would have known that deferred revenues would have increased significantly from the 2012 amount, as revenues increased.  Management was well aware of the liability that was not reported on TL's balance sheet and had an obligation to report it to the bank.  Moreover, its decisions to expand rapidly and drain the business of cash cannot be blamed on an accountant's report that is issued once per year, months after year end.  Rather, the decisions were the result of management who are devoted fulltime to the business.

---

[80] Bonadio Report, p.4.
[81] GRB Loan Minutes, Dave Halladay Deposition Exhibits, March 29, 2019, p.24.
[82] Email from Mr. Naylon to Mr. Linehan, August 18, 2012.

     o   Some other factors (besides the unsubstantiated and alleged involvement of Rizzo) that impacted TL's bankruptcy, as per their own bankruptcy filing, included:

         1) TL had several unsuccessful locations, the losses of which exceeded collected earnings;

         2) Aggressive competition required aggressive marketing;

         3) TL struggled to maintain their competitive workforce;

         4) The Chapter 7 liquidation of ALC's assets, one of the largest competitors in the industry, flooded the market with discounted lasers;

         5) Management standpoint – too much growth too fast;

         6) They were unable to insure consistent management of the locations and had a lack of sufficient oversight. [83]

- Mr. Salomon is not a business appraiser and is, therefore, not qualified, to opine on the fair market value of TL. Additionally, as a CPA, he is required to follow the AICPA business valuation standards, Statement on Standards for Valuation Services VS Section 100 (SSVS), which he did not do. Further, Mr. Salomon is in violation of the AICPA Code of Professional Conduct by acting as an appraiser, without appropriate qualifications, and by not following SSVS.

- Mr. Salomon utilizes Revenue Ruling 59-60 in defining fair market value. Revenue Ruling 59-60 is not applicable to non-tax engagements. The correct definition is set forth in the SSVS, which adopted the International Glossary of Business Valuation Terms:

     o   The international glossary of business valuation terms defines fair market value as, "*the price, expressed in terms of cash equivalents, at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting at arm's length in an open and unrestricted market,*

---

[83] Disclosure Statement – Chapter 11 Plan of Reorganization, United States Bankruptcy Court, Northern District of New York, Chapter 11, Case No.-12091, pp. 15 – 16.

*when neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts."*

- o Mr. Linehan and Mr. Naylon are not hypothetical buyers.  They are specific buyers.  No business valuation was done prior to the transaction between Mr. Linehan and Mr. Naylon.  Consequently, we do not know if the transaction represents fair market value.

- o Mr. Castor's interference in the banking relationship of TL resulted in the bank shutting down TL's operating account, effectively forcing the Company into bankruptcy.  As such, the Company was under compulsion and the fair market value standard of value is not applicable.

- Mr. Salomon's damage calculation directly contradicts his deferred revenue position. On pages 33 - 34 of the Salomon Report, he describes how the fair market value of TL pre-expansion approximates $7.8M - $8M, based on what Mr. Linehan was willing to pay for his share in 2012.  However, he also notes that during this same period, the deferred revenue balance could have approximated $2M. [84]  The Bonadio Report notes that annualized 2012 revenues were projected at less than $2M. [85]  There are also emails between the financial advisors, Mr. Naylon and Mr. Linehan that indicate the deferred balance at the time of the transaction approaches $4M.  However, Mr. Salomon's position is that TL's value in 2012 was approximately $8M, the value that Mr. Linehan, who helped plunder the Company into bankruptcy within three years, was willing to pay at that time.  Even as his own due diligence advisor noted the presence of an undisclosed liability potentially valued at $4M, Mr. Linehan still proceeded with his investment unable or unwilling to negotiate a discount from the price that was offered.

- Rizzo is not responsible for any damages that may have occurred.

---

[84] Salomon Report, p. 26.
[85] Bonadio Report, p. 7.

o  The parties were aware of deferred revenues and of the existence of the Finder's Agreement and chose to enter into the Purchase Agreement with full knowledge of both of these issues.

o  Management made reckless decisions by expanding rapidly and stripping the Company of working capital, counter to the advice provided by Bonadio. [86]

o  TL's opportunity to sell the business, or a portion of the business, as a going concern was thwarted by the actions of Mr. Castor and Mr. Linehan, whose meeting at GRB resulted in the bank freezing TL's operating account.

o  Mr. Linehan and Mr. Naylon paid themselves guaranteed payments/distributions totaling nearly $3M during 2013 - 2014. Consequently, these actions deprived the company of working capital that was needed to fund their growth and ongoing operations. Mr. Salomon neglected to factor these payments into his analysis.

o  TL's demise was the result of poor management that made decisions detrimental to the business, which, combined with market forces, resulted in bankruptcy. Rizzo's financial statements were not the factor driving management's decisions.


## VII.    Qualifications

My qualifications are summarized on my Curriculum Vitae, attached as *Appendix A*.

This concludes my report at this time.

_____

James I. Marasco, CPA/CFF, CIA, CFE

   12-2-20
_____

Date

_____

[86] Bonadio Report, p. 4.

## APPENDIX A - CURRICULUM VITAE
## JAMES I. MARASCO, CPA/CFF, CFE, CIA

## Professional Experience

**Present**:  Managing Partner, EFPR Group and Partner, Litigation & Forensic Services, Stonebridge Business Partners, a specialty auditing, forensic accounting and consulting firm and related entity of EFPR Group, LLP, a Western New York-based certified public accounting firm, 1998 to present.

Business Address:       100 South Clinton Avenue, Ste 1500
                        Rochester, NY  14604
                        585.427.8900

Manager, Management Advisory Services, 1996 - 1998;
Accounting and Auditing Member, 1990 - 1996

## Education

B.S. in Business Administration, St. Bonaventure University, 1990, Cum Laude
Secondary Concentration, History

## Affiliations and Credentials

Adjunct Professor of Forensic Accounting – St. John Fisher College (2013 to 2018)

Certified Public Accountant (1992 to present), licensed in NY, PA and FL

Certified Fraud Examiner (1997 to present)

Certified Internal Auditor (1998 to present)

Certified in Financial Forensics (2008 to present)

Member, American Institute of Certified Public Accountants

Member, New York State Society of Certified Public Accountants

Member, Institute of Internal Auditors

Member, Association of Certified Fraud Examiners

Member, Association of Healthcare Internal Auditors

Member, NYS Chapter of Special Investigation Units

25

CURRICULUM VITAE (*Continued*)

JAMES I. MARASCO, CPA/CFF, CFE, CIA

# Selected Speeches and Seminars Presented, Publications, etc.

"Corporate Fraud," Presentation given to the local chapter of the New York State Society of CPA's, Rochester, New York, May 2008

"Theft by Collusion-Five Times More Loss", Article published by Fraud Matters (A CPAmerica International Publication), Spring 2008

"Economic Hard Times: The Impact on Fraud", Article published by Fraud Matters (A CPAmerica International Publication), Fall 2008

"Fraud in a Recession", Presentation given to faculty and staff of St. Bonaventure University, St. Bonaventure, New York, October 2008

"Investing is a minefield demanding careful steps,", Article published by Democrat & Chronicle, February 2009

"Fraud du Jour", Article published by Rochester Business Journal, April 2009

"Protect Yourself: Don't become a victim of a Ponzi Scheme", Article published by Fraud Matters (A CPAmerica International Publication), Spring 2009

"Who's Minding Your Investments (or why you can't sleep at night)", Presentation given to the Monroe County Bar Association, Rochester, New York, October 2009

"New Identity Theft "Red Flags Rule" Begins", Article published by Fraud Matters (A CPAmerica International Publication), Fall 2009

"Increasing the Perception that Fraud will be Detected", Article published by Fraud Matters (A CPAmerica International Publication), Fall 2009

"The Varying Faces of Fraud-who's wearing them and how do you safeguard against it", Presentation given at the annual fraud conference sponsored by the AGA-New York Capital Chapter, Albany, New York, November 2009

"Don't Become a Victim of the Underground Economy", Article published by Fraud Matters (A CPAmerica International Publication), Winter 2010

"Businesses Impacted by Growing Healthcare Fraud", Article published by Fraud Matters (A CPAmerica International Publication), Winter 2010

"Protecting Your Intellectual Property from Fraud and Abuse", Article published by Fraud Matters (A CPAmerica International Publication), Spring 2010

"Internal Revenue Service Cracking Down on Fraud", Article published by Fraud Matters (A CPAmerica International Publication), Spring 2010

## CURRICULUM VITAE (*Continued*)

## JAMES I. MARASCO, CPA/CFF, CFE, CIA

"Protecting Against Procurement Fraud, Article published by Fraud Matters (A CPAmerica International Publication), Summer 2010

"Is Anything What is Seems?", Article published by The Daily Record), July 2010

"Preventing and Responding to Identity Theft", Article published by Fraud Matters (A CPAmerica International Publication), Fall 2010

"Investigating a Suspected Fraud: Why, When, How", Article published by Fraud Matters (A CPAmerica International Publication), Winter 2011

"Your Phone may be Smart, but is it Safe?", Article published by The Daily Record), January 2011

"Safeguarding Against Credit Card Fraud", Article published by Fraud Matters (A CPAmerica International Publication), Spring 2011

"Does Fraud Really Thrive During a Recession?", Article published by The Daily Record, May 2011

"External Threats Facing Your Organization", Article published by Fraud Matters (A CPAmerica International Publication), Summer 2011

"Is Your Organization Required to be Compliant with the Red Flags Rule?", Article published by Fraud Matters (A CPAmerica International Publication), Summer 2011

"Protecting Against Credit Card Fraud", Article published by Fraud Matters (A CPAmerica International Publication), Fall 2011

"The Varying Faces of Fraud", Presentation given to the Rochester/Buffalo Chapter of the ASA, Batavia, New York, October 2011

"Preventing Workers' Compensation Fraud", Article published by Fraud Matters (A CPAmerica International Publication), Winter 2012

"Workers' Compensation – the Common Misconception", Article published by Fraud Matters (A CPAmerica International Publication), Winter 2012

"Fraud in the New Millennium", Presentation given to the Association for Financial Professionals of Western New York, Victor, New York, January 2012

"Threats Facing Organizations in the Information Age:, Article published by The Daily Record, May 2012

"Be sure Background Checks are Thorough", Article published by Inventory Counts (A CPAmerica International Publication), Fall 2012

"Fraud Threats Facing Today's Businesses", Article published by Fraud Matters (A CPAmerica International Publication), Summer 2012

## CURRICULUM VITAE (*Continued*)

## JAMES I. MARASCO, CPA/CFF, CFE, CIA

"Staying in Compliance", Presentation given at the National Safe Environment/Victim Assistance Leadership Conference, Omaha, Nebraska, August 2012

"Allegations & Audits", Presentation given to Roman Catholic Diocesan Personnel broadcast nationally from Washington, DC, October 2012.

"Recovering Abandoned Funds in New York State", Live television interview on WROC Channel 8 – Sunrise Program, Rochester, New York, December 17, 2012

"Safeguarding Against Expense Reimbursement Fraud", Article published by Fraud Matters (A CPAmerica International Publication), Winter 2013

"Using Social Media to Curtail Fraud", Article published by Fraud Matters (A CPAmerica International Publication), Winter 2013

"The Importance of Background Checks and Monitoring", Presentation given at the National Safe Environment/Victim Assistance Leadership Conference, San Francisco, California, July 2013

"Using the Public to Monitor Each Other", Article published by The Daily Record, July 8, 2013

"Even After Death, Your Identity Still is at Risk", Article published by The Daily Record, August 12, 2013

"'Tis the Season for Fraud", Article published by The Daily Record, December 9, 2013

"Protecting yourself against credit/debit card fraud", Article published by The Daily Record, February 12, 2014

"Email Scams get tougher to spot", Article published by The Daily Record, April 2014

"Your SBIR Can Get You Sued?: Fraud Enforcement Risks for Grant Recipients", Presentation given at the New York BIO- CONference, New York, New York, May 2014

"Often Overlooked Consequences of Hiding Income", Article published by The Daily Record, June 2014

"The Allure and Danger of Affinity Fraud Schemes", Article published by The Daily Record, August 2014

"Exploitation Situation Investigation: Myths and Realities of a Financial Exploitation Investigation", Presentation given at the 2014 NYS Adult Abuse Training Institute, Albany, New York, September 2014

"Should You Trust the Cloud?", Article published by The Daily Record, October 2014

"Protecting Yourself Against Tax Return Fraud", Article published by The Daily Record, February 2015

## CURRICULUM VITAE (*Continued*)

## JAMES I. MARASCO, CPA/CFF, CFE, CIA

"Scammers Keeping up with Social Media", Article published by The Daily Record, April 2015

"Fraud Can Follow You to the Grave with Funeral Fraud", Article published by the Daily Record, June 2015

"Safeguards to Avoid Online Selling Schemes", Article published by the Daily Record, August 2015

"Corporate Fraud – the Executive's Survival Guide", Chapter contribution – "Interviewing Skills and Techniques", October 2015

"Clarifying the Issues Surrounding Chip-Enabled Credit Cards", Article published by the Daily Record, December 2015

"Spotlight and the Catholic Church", Live television interview on WHAM Channel 13 – Evening News, Rochester, New York, March 2016

"Protecting Against Expense Reimbursement Fraud and Abuse", Article published by the Daily Record, June 2016

"Voter Fraud", Article published by the Daily Record, November 2016

"Tax Fraud", Live television interview on WROC Channel 8 – Evening News, Rochester, New York, February 21, 2017

"The Dangers of Open Wi-Fi", Article published by the Daily Record, February 2017

"Keeping Your Tax Return Safe", Article published by the Daily Record, April 2017

"Questions Arising from Common Myths", Article published by the Daily Record, June 2017

"How Blockchain will Safeguard the Future", Article published by the Daily Record, November 2017

"Understanding the Risks of Cryptocurrency", Article published by the Daily Record, February 2018

"Is There Such Thing as Privacy Anymore?", Article published by the Daily Record, May 2018.

"Are We Being Duped in the Foods we Purchase?", Article published by the Daily Record, July 2018.

"Trying to Identify Fraud in your Organization", Article published by the Daily Record, September 2018.

"Holiday Shoppers – Be Warned", Article published by the Daily Record, November 2018.

"Spotting Fraud and Identifying Threats in the Information Age", Presentation to the Office of DC Auditor, Washington, DC, February 2019.

"Contractor Fraud", Article published by the Daily Record, March 2019.

## CURRICULUM VITAE (*Continued*)

### JAMES I. MARASCO, CPA/CFF, CFE, CIA

"Man's best friend – do we know what we are feeding him?", Article published by the Daily Record, August 2019.

## Deposition and Trial Testimony in Past Seven Years

State of New York v. Erin Hopkins (Criminal Action No. 12-355727), Monroe County Supreme Court. 7th Judicial District
Testified in grand jury

State of New York v. Sharon Morrison, State of New York Supreme Court. 6th Judicial District
Testified in guardian petition hearing

Christopher DiMascio v. Jeffrey Kaplan, AAA Matter No.: 1 15 00081 12, Rochester, NY
Testified in arbitration hearing

State of New York v. Andrzej Gierczak, State of New York County Court, 7th Judicial District.
Testified in trial

Daniel F. Raider v. I Gordon Corporation, et al (Index No. 12/6678), State of New York Supreme Court, Monroe County.
Testified in deposition

A.R.K. Patent International, LLC, Tarksol, Inc. and A. Richard Koetzle  v. Mark Levy and Mark Levy & Associates, PLLC (Index No.: 14260/07), State of New York Supreme Court, County of Monroe
Testified in trial

Richard Shaheen v. Pinecrest Associates, et al (Case No. 01-16-0004-4654), Rochester, NY
Testified in arbitration hearing

Bull Communications, Inc. v. Paetec Communications, Inc. and Windstream Corporation (Index No.: 10-7108), State of New York Supreme Court, County of Monroe
Testified in deposition

The Official Committee of Unsecured creditors of Cornerstone Homes Inc. and Michael H. Arnold, Chapter 11 Trustee of Cornerstone Homes, Inc. v. First Citizens National Bank and The Community Preservation Corporation. (Case No.: 2-13-21103-PRW), US Bankruptcy Court, Western District of New York
Testified in deposition

Laureen Burke, M.D. v. Woman Gynecology & Childbirth Associates, PC (Index No.: 12-9440), State of New York Supreme Court, County of Monroe
Testified in trial

## CURRICULUM VITAE (*Continued*)

### JAMES I. MARASCO, CPA/CFF, CFE, CIA

Saetec, Inc. v. Paetec Communications, Inc. and Windstream Corporation (Index No.: 13-11176), State
of New York Supreme Court, County of Monroe
Testified in deposition

Robert M. Gleason, Jr. v. Schuler-Hass Electric Corp., Rochester, NY
Testified in arbitration hearing

Hopkins of Sodus, LLC v. Water Wise of America, Inc. Rochester, NY
Testified in arbitration hearing

Daniel Gerber, Frank Ciano, et al v. Goldberg Segalla, LLP (AAA No.:  01-17-9997-0352), Buffalo, NY
Testified in arbitration hearing

David Lance New York, Inc. v. Scott Skoller, Adrian Jules, Ltd., SS Bespoke, Inc. and Patricia Espinoza
(Index No.: 17-652892), State of New York Supreme Court, County of New York
Testified in arbitration hearing (originally scheduled for trial)